**NOT FOR PUBLICATION**

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| Cecil Z., | |
| Plaintiff, | |
| v. | Civil Action No. 24-10936 (RK) |
| COMMISSIONER OF SOCIAL SECURITY, | **OPINION** |
| Defendant. | |

**KIRSCH, District Judge**

    **THIS MATTER** comes before the Court on Cecil Z.'s[1] ("Cecil" or "Plaintiff") appeal from the Commissioner of the Social Security Administration's (the "Commissioner" or "Defendant") final decision, which denied Cecil's request for Social Security disability insurance benefits. (ECF No. 1.) The Court has jurisdiction to review this appeal under 42 U.S.C. § 405(g) and reaches its decision without oral argument pursuant to Local Civil Rule 78.1. For the reasons below, the Court **AFFIRMS** the Commissioner's decision.

## I.    BACKGROUND

    In this appeal, the Court must answer the following question: does substantial evidence support Administrative Law Judge Kenneth Ayers's ("Judge Ayers") determination that Cecil was not disabled?

---

[1] The Court identifies Plaintiff by first name and last initial only. *See* D.N.J. Standing Order 2021-10.

### A.    PROCEDURAL POSTURE

Cecil filed an application for disability insurance benefits on March 17, 2022. (Administrative Record ("AR") at 17, 64, 74.)[2] The Social Security Administration (the "Administration") denied the request initially (*id.* at 101) and upon reconsideration (*id.* at 106). Cecil then requested a hearing before an Administrative Law Judge ("ALJ"). (*Id.* at 131.) On March 5, 2024, Cecil appeared at a telephone or video hearing before Judge Ayers,[3] wherein he heard testimony from Cecil, who was represented by counsel, and a vocational expert, Timothy Andenmatten ("VE"). (*Id.* at 34–62.) On May 22, 2024, Judge Ayers issued a written decision finding that Cecil was not disabled. (*Id.* at 17–33.) After receiving notice of the unfavorable decision, Cecil requested review by the Appeals Council. (*Id.* at 193–94.) On October 16, 2024, the Appeals Council determined that the reasons asserted by Cecil for appeal "do not provide a basis for changing the Administrative Law Judge's decision." (*Id.* at 1.)

This appeal followed. (ECF No. 1.) The Administrative Record was filed on February 4, 2025. (ECF No. 4.) Cecil filed a moving brief (ECF No. 5, "Pl. Br."), the Commissioner responded (ECF No. 7, "Def. Opp."), and Cecil replied (ECF No. 8). The appeal is now ripe for review by this Court.

---

[2] The Administrative Record ("AR") is available at ECF Nos. 4-1 through 4-15. This Opinion will reference only page numbers in the record without the corresponding ECF numbers. Regarding the filing date, one document within record indicates that Cecil filed for benefits on March 23, 2022. (AR at 201–02.) The exact date does not alter the Court's analysis.

[3] The ALJ's decision indicates that the hearing was held via video. (AR at 17.) However, the hearing transcript indicates that it held over the telephone. (*Id.* at 37.) Either way, Cecil did not object to the method of the hearing. (*Id.* at 17, 37.)

### B.    JUDGE AYERS'S DECISION

On October 19, 2023, Judge Ayers issued a decision finding that Cecil was not disabled from his alleged onset date of January 1, 2018 through the date of decision. (AR at 17–33.) At the time of the alleged onset date, Plaintiff was forty-six-years old, had graduated high school and attended some college, and had served in the Marine Corps and worked as a police officer in patrolman and detective roles. (*Id.* at 23, 42.) At the hearing, Plaintiff's attorney explained that Plaintiff suffers from post-traumatic stress disorder ("PTSD") stemming from a situation where Plaintiff, as a police officer, arrested Joseph D'Amico ("D'Amico") who later "put a hit out on" Plaintiff. (*Id.* at 39; *see also id.* at 460–61.) Specifically, notes from a doctor evaluating Plaintiff reveal that, while in prison, D'Amico asked members of the Aryan Brotherhood to kill Plaintiff. (*Id.* at 461.) After the Mercer County Prosecutor's Office learned of this, they placed an officer in the prison to pose as a hitman. (*Id.*) Arrangements were made between the officer posing as a hitman and D'Amico up until the point that D'Amico could not come up with the money to pay the "hitman." (*Id.*)[4]

Plaintiff testified that he suffers from flashbacks, intrusive thoughts, nightmares, episodes of dissociation, and hypervigilance as a result of this event. (*Id.* at 45–49.) Plaintiff further explained that the nightmares cause him to wake in a cold sweat and vomit about twice a week. (*Id.* at 45.) When this happens, Plaintiff testified, he secludes himself from his wife and daughter and does not leave the house for a few days. (*Id.* at 46.) During these periods, he explained that he becomes depressed, he does not "have the energy to do much," and his hygiene deteriorates. (*Id.* at 46–47.) He further explained that his dissociative episodes occur about weekly. (*Id.* at 47.) He does not realize that these are occurring while they happen. (*Id.* at 47–48.) He gets "a vacant

---

[4] It is unclear if D'Amico faced additional charges stemming from this allegation. (AR at 461.)

expression on [his] face" and his wife, his daughter, or someone else has to "yell . . . a few times" to get his attention. (*Id.* at 48.) Cecil testified that after these episodes he is "usually nauseous," "usually sweating," and "very reticent to leave [his] house and be around people." (*Id.*) He testified that he is hypervigilant "all the time pretty much," and that this causes him to make sure everyone is secured, that windows and doors are locked, and that people are not following him while he is driving. (*Id.* at 49.) It also causes him to dislike going to public places. (*Id.*) Plaintiff also testified that his intrusive thoughts make it difficult for him to concentrate and maintain focus. (*Id.* at 49–50.) Plaintiff further explained that he previously drank to "self-medicat[e]" and that he suffers from a heart condition that causes physical limitations and episodes of irregular heart rhythm. (*Id.* at 52–54.) Plaintiff testified that he has not worked since the alleged onset of his disability on January 1, 2018. (*Id.* at 42.)

In reaching his determination that Cecil was not disabled, Judge Ayers applied the five-step process for determining whether an individual is disabled as set forth in 20 C.F.R. § 404.1520(a). (*Id.* at 18–19.) At Step One, Judge Ayers found that Cecil had not engaged in substantial gainful activity since the alleged onset date, January 1, 2018.[5] (*Id.* at 20 (citing 20 C.F.R. § 404.1571 *et seq.*).)

At Step Two, Judge Ayers found that Cecil suffered from five severe impairments: (1) coronary artery disease, (2) status-post stenting, (3) posttraumatic stress disorder, (4) major depressive disorder, and (5) anxiety disorder. (*Id.* (citing 20 C.F.R. § 404.1520(c)).) The ALJ also analyzed six additional impairments and concluded that each one was non-severe. (*Id.*) The ALJ first concluded that Plaintiff's hypertension, high cholesterol, gastritis, and premature ventricular

---

[5] While Cecil did earn $34,408 in 2018 and $59,229.58 in 2020, the ALJ concluded that those "earnings represent[ed] accrued and/or short-term benefits from sick/vacation repayment and . . . not earnings from work activity." (AR at 20.)

contraction were non-severe because the medical record did not indicate any complications or ongoing limiting physical symptoms related to those conditions. (*Id.* (citing *id.* at 1251–1317, 1505–21).) The ALJ next considered Plaintiff's obesity and determined that it was non-severe because "there [wa]s no indication that either singularly or in combination it would result in more than de minimis functional limitations." (*Id.*) Finally, the ALJ determined that alcohol abuse was not a severe impairment because that condition was "in the remote past," "in remission," and "mostly before the alleged onset day." (*Id.*)

At Step Three, the ALJ determined that Cecil did not have an "impairment or combination of impairments" that qualified under the Administration's listed impairments. (*Id.* at 20–22 (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526).)

Judge Ayers then moved to the precursor to Step Four where he accounted for Cecil's alleged symptoms and assessed whether those allegations were consistent with the medical evidence in the record. (*See id.* at 22) In doing so, the ALJ followed a two-step process. (*Id.*) *First*, the ALJ considered whether there was a "medically determinable physical or mental impairment[]" (in other words, an impairment that could "be shown by medically acceptable clinical or laboratory diagnostic techniques") "that could reasonably be expected to produce [Cecil]'s pain or other symptoms." (*Id.*) *Second*, the ALJ evaluated "the intensity, persistence, and limiting effects of [Cecil]'s symptoms to determine the extent to which they limit [Cecil]'s work-related activities." (*Id.* at 23.) The ALJ ultimately determined that Cecil's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (*Id.*) However, the ALJ explained that Cecil's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (*Id.*)

Regarding Cecil's physical impairments, the ALJ noted that Cecil had suffered from chest pain and underwent cardiac catheterization. (*Id.*) However, the ALJ cited records from an August 11, 2022 examination wherein Cecil denied chest pain, reported exercising an average of five times per week, characterized his fitness and stamina as "very good," and had a normal physical examination. (*Id.* at 24 (citing *id.* at 705–41).) Additionally, in another examination on September 12, 2022, Cecil reported that he had not experienced chest pains in eleven months, indicated that he was taking medication, and again had a normal physical examination. (*Id.* at 23 (citing *id.* at 748–52).) Indeed, the physician examining Cecil only diagnosed him with hypertension. (*Id.* (citing *id.* at 748–52).) Accordingly, the ALJ concluded that the medical evidence did not support a finding that his physical impairments constituted disabling limitations. (*Id.* at 25.)

Judge Ayers next turned to psychological impairments. Citing to Cecil's Function Report, Judge Ayers noted that Cecil claimed he could not leave his house and could not "go to crowded, public places without people that he trusts, and only under the right circumstances." (*Id.* at 23 (citing *id.* at 260–67).) Judge Ayers further explained that Cecil reported "horrible dreams, intrusive thoughts, and [that] he sleeps on the floor with his dogs a lot." (*Id.* (citing *id.* at 260–67).)

Judge Ayers concluded that the objective medical evidence confirmed Cecil's psychological impairments. (*Id.* at 24.) Judge Ayers first examined a May 13, 2018 evaluation performed by Dr. Gary Glass. (*Id.*) During that evaluation, Cecil reported problems with concentration, attention span, sleep, energy level, depression, "overwhelming" anxiety, episodes of dissociation, and paranoia and fear, but he denied being irritable or having past or present thoughts of suicide. (*Id.*) Dr. Glass observed that Cecil's speech was clear and coherent, that he was "sullen and depressed," and that his cognitive functions and memory were "fine." (*Id.*) Dr. Glass ultimately assessed Cecil with "moderate to severe symptoms of PTSD," opined that these

symptoms would likely interfere with his ability to "work as a police officer/detective and found him unfit for duty," and recommended treatment via medication and therapy. (*Id.*)

Judge Ayers also looked to a September 8, 2022 examination conducted by Dr. Zulfiqar Rajput at the request of the Administration. (*Id.*) During that examination, Cecil complained of nightmares and flashbacks, anxiety and nervousness, crying spells, feelings of hopelessness and helplessness, and intrusive thoughts and dreams. (*Id.*) Notwithstanding, Dr. Rajput observed that Cecil was fully oriented, behaved normally, had good eye contact, was able to concentrate on the conversation, and had normal motor activity. (*Id.*) Dr. Rajput also noted that Cecil's thought processes were logical and goal directed, that his abstraction ability and insight were good, and that his memory was good. (*Id.*) Although Dr. Rajput concluded that Cecil's judgment was poor, he attributed this to Cecil "not seeing a psychiatrist or following the recommendation of a psychiatrist which was necessary for improvement of the PTSD and anxiety." (*Id.*)

The ALJ also cited treatment records from Dr. Jeffrey Rednor. (*Id.* at 25.) These records revealed that, while Cecil continued to suffer from anxiety, he had normal mood and affect, he behaved normally, he was alert and fully oriented, and his thought content and judgment were normal. (*Id.*) Furthermore, the ALJ observed that the treating records did not indicate that Cecil required assistance with daily activities. (*Id.*)

Overall, Judge Ayers determined that "the medical evidence [did] not support a finding of disabling limitations." (*Id.*) Judge Ayers explained that the medical records showed that medication had been effective at managing Cecil's symptoms and that there had been "a significant, though incomplete, improvement of his conditions." (*Id.*) Although the record showed that Cecil had problems with anxiety and stress, Judge Ayers found that the evidence did not indicate that Cecil required any assistance with daily activities or that he was unable to

independently make or fulfill plans. (*Id.* at 26.) In sum, the ALJ underscored that "almost every mental status examination submitted by his treating physician reflects that his cognitive functioning is unimpaired." (*Id.*)

The ALJ also noted that Cecil's statements in his own Function Report contradicted his position that he could not work due to his disability. (*Id.*) Specifically, Cecil represented in his Function Report that he could take care of his personal needs, take care of his pets, prepare meals, perform household chores, do his laundry, take his dogs out every day, go out alone, go to the gym, go fishing, and travel by driving or riding his motorcycle. (*Id.* (citing *id.* at 260–67).)

Judge Ayers next evaluated the medical opinions and prior administrative medical findings before him. (*Id.*) *First*, Disability Determination Service ("DDS") found severe physical and psychological impairments and severe impairments involving alcohol abuse. (*Id.*) The ALJ found these opinions to be of reduced persuasiveness because "DDS consultants are non-examining physicians" and they "did not review additional medical evidence submitted after earlier periods of adjudication which" supported the ALJ's determination. (*Id.* at 27.) *Second*, the ALJ examined the medical opinions of Dr. Glass and Dr. Lewis Schlosser. (*Id.*) Both of these opinions stemmed from evaluations conducted in 2018 and stated that Cecil could not perform his previous work as a police officer. (*Id.*) The ALJ concluded that these opinions were not "inherently persuasive" because they were "from very early in the period under consideration and they do not give specific functional limitations regarding [Cecil]'s vocational abilities." (*Id.*) Moreover, these reports were drafted to determine Cecil's fitness to continue as a police officer and simply indicated that he was "not capable of performing his past work which is an issue reserved to the Commissioner." (*Id.*)

Ultimately, Judge Ayers determined that Cecil had the following Residual Functional Capacity ("RFC"):

> to perform light work as defined in 20 [C.F.R. §] 404.1567(b) except [Cecil] can work at unprotected heights occasionally and around hazardous moving mechanical parts occasionally. Due to limitations in concentration, persistence or pace [Cecil] can perform simple, routine tasks and make simple work-related decisions. He is able to interact with supervisors occasionally. He is able to interact with coworkers occasionally but can never interact with the public. He is able to tolerate no more than occasional changes in routine work setting.

(*Id.* at 22.)

At Step Four, Judge Ayers found that Cecil was unable to perform his past work as a police officer or detective. (*Id.* at 27–28 (20 C.F.R. § 404.1565).) Thus, despite finding their opinions "not inherently persuasive," the ALJ reached the same conclusion as Drs. Glass and Schlosser. (*Id.* at 27.)

Finally, at Step Five, accounting for Cecil's RFC, age, education, and work experience, in conjunction with testimony offered by the VE at the March 5, 2024 hearing, Judge Ayers found that there were jobs "that exist in significant numbers in the national economy" that Cecil could perform. (*Id.* at 28–29 (citing 20 C.F.R. §§ 404.1569, 404.1569a).) Specifically, the VE testified— and the ALJ concluded—that Cecil could work as a marker, routing clerk, or mail clerk. (*Id.* at 29.) Accordingly, Judge Ayers found that Cecil had not been disabled from his alleged onset date of January 1, 2018 through the date of his decision. (*Id.*)

## II.    LEGAL STANDARD

### A.    STANDARD OF REVIEW

The Court reviews the Commissioner's final decision to determine whether the Commissioner's findings are "supported by substantial evidence." 42 U.S.C. § 405(g). If the Appeals Council denies a claimant's request for review, "the ALJ's decision is the Commissioner's final decision." *Matthews v. Apfel,* 239 F.3d 589, 592 (3d Cir. 2001). Substantial evidence is "more than a mere scintilla but may be somewhat less than a preponderance of the evidence." *Zirnsak v.*

*Colvin*, 777 F.3d 607, 610 (3d Cir. 2014) (quoting *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005)). Put differently, "[i]t means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Smith v. Comm'r of Soc. Sec.*, 631 F.3d 632, 633 (3d Cir. 2010) (quoting *Reefer v. Barnhart*, 326 F.3d 376, 379 (3d Cir. 2003)). This evidentiary threshold "is not high." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019).

The scope of the Court's review of the ALJ's decision is "quite limited." *Rutherford*, 399 F.3d at 552. On review, the Court may not "re-weigh the evidence or impose [its] own factual determinations." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 359 (3d Cir. 2011) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently." *Fargnoli v. Massanari,* 247 F.3d 34, 38 (3d Cir. 2001) (citing *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999)).

### B.    ESTABLISHING ELIGIBILITY FOR DISABILITY INSURANCE BENEFITS

A claimant may establish disability under the Social Security Act by proving that he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The ALJ applies a well-established "five-step sequential evaluation process," which requires considering whether the claimant:

> (1) is engaged in substantial gainful activity; (2) suffers from an impairment or combination of impairments that is "severe"; (3) suffers from an impairment or combination of impairments that meets or equals a listed impairment; (4) is able to perform his or her past relevant work; and (5) is able to perform work existing in significant numbers in the national economy.

*McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004) (citing 20 C.F.R. §§ 404.1520(a)–(f)). The claimant bears the burden at the first four steps, at which point it shifts to the Commissioner at Step Five. *Hess v. Comm'r of Soc. Sec.*, 931 F.3d 198, 201 (3d Cir. 2019) (citing *Smith*, 631 F.3d at 634).

## III.   DISCUSSION

Cecil appeals Judge Ayers's determination of non-disability. (*See* ECF No. 1.) He raises three issues on appeal: *first*, that Judge Ayers failed to consider the treatment notes of Plaintiff's therapist, Pamela Brolin; *second*, that Judge Ayers acted inconsistently by discounting the medical opinions of Drs. Glass and Schlosser but relying on their findings in conducting the Step Three analysis; and *third*, that Judge Ayers failed to rule on his objection to the VE's testimony. (Pl. Br. at 8–16.) For the reasons explained below, the Court **AFFIRMS**.

### A.   BROLIN EVIDENCE

Cecil first argues that the ALJ erred in failing to consider medical evidence from Brolin, Cecil's treating therapist. (Pl. Br. 8–11.) The Commissioner responds that Cecil's attorney summarized the evidence for the ALJ, the list of exhibits that the ALJ considered in formulating the RFC included the Brolin evidence, the ALJ need not discuss every piece of evidence in the record, and the ALJ's decision was reasonably discernable. (Def. Opp. at 8–9.)

As an initial matter, it is important to draw a distinction between *considering* evidence and *discussing* evidence. An ALJ may consider the entire record without discussing each piece of evidence contained therein. *See Phillips v. Barnhart*, 91 F. App'x 775, 780 n.7 (3d Cir. 2004) ("[T]he ALJ's mere failure to *cite* specific evidence does not establish that the ALJ failed to *consider* it." (emphasis added) (citing *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998))). To that end, the United States Court of Appeals for the Third Circuit has explained that, while the ALJ

must "consider and evaluate the medical evidence in the record consistent with his responsibilities under the regulations and case law," the Court does "not expect the ALJ to make reference to every relevant treatment note in a case where the claimant . . . has voluminous medical records." *Fargnoli*, 247 F.3d at 42. Put another way, "[t]here is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004).

Of course, an ALJ decision that simply stated "I have considered all evidence and conclude that the claimant is not disabled" could not stand. *Some* evidence must be discussed. Specifically, certain types of evidence must be discussed by regulation, *see* 20 C.F.R. § 404.1520c(b) ("We will articulate in our determination or decision how persuasive we find all of the medical opinions and all of the prior administrative medical findings in your case record."), and the ALJ's overall discussion of the evidence must be robust enough to permit meaningful judicial review, *see Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119 (3d Cir. 2000); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981). Cecil contends that the ALJ was required to discuss the Brolin evidence both by regulation and to permit meaningful judicial review.

Cecil contends that the ALJ's failure to discuss the Brolin evidence violated 20 C.F.R. § 404.1520c. (Pl. Br. at 11.) As an initial matter, Section 404.1520c applies only to "medical opinions and prior administrative medical findings." 20 C.F.R. § 404.1520c. These are but two of many categories of evidence that the ALJ must consider. *See* 20 C.F.R. § 404.1513. The Brolin notes are clearly not "prior administrative medical findings" because they are not findings "about a medical issue made by . . . Federal and State agency medical and psychological consultants at a prior level of review in a [claimant's] current claim." *See* 20 C.F.R. § 404.1513(a)(5). So, the

question becomes whether the Brolin evidence is a medical opinion. For claims filed on or after

March 27, 2017, such as Cecil's:

> A medical opinion is a statement from a medical source about what [the claimant] can still do despite [his] impairment(s) and whether [he has] one or more impairment-related limitations or restrictions in the following abilities: . . .
>
> (i)  [His] ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching);
>
> (ii)  [His] ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting;
>
> (iii)  [His] ability to perform other demands of work, such as seeing, hearing, or using other senses; and
>
> (iv)  [His] ability to adapt to environmental conditions, such as temperature extremes or fumes.

20 C.F.R. § 404.1513(a)(2); (*see* AR at 17, 64, 74 (noting that Cecil filed for benefits in March of

2022).) Conversely, "judgments about the nature and severity of [the claimant's] impairments,

[his] medical history, clinical findings, diagnosis, treatment prescribed with response, or

prognosis" absent any discussion of work-related limitations are considered "[o]ther medical

evidence." 20 C.F.R. § 404.1513(a)(3).

Here, Cecil highlights Brolin's discussion of his symptoms, diagnoses, prognosis, and

Global Assessment Functioning ("GAF") score. (Pl. Br. at 10 (citing AR at 1097, 1127, 1213,

1219, 1239, 1242, 1244, 1322, 1324).) However, none of these are tied to any functional work-

related limitation. Instead, they are general statements about Cecil's condition. Accordingly, they

are best classified as "other medical evidence." In fact, regarding the GAF score in particular, the

Administration now categorizes GAF scores "as other medical evidence." *Coats v. Kijakazi*, No.

21-1762, 2023 WL 2706857, at *12 (M.D. Fla. Mar. 30, 2023) (internal quotation marks omitted);

*see Tiffany T. v. Comm'r of Soc. Sec.*, No. 22-626, 2023 WL 10949091, at *11 (D. Conn. Sept. 1,

2023) (similar), *report and recommendation adopted*, 2024 WL 1230256 (D. Conn. Mar. 22, 2024). Therefore, because the Brolin evidence was neither a prior administrative medical finding nor a medical opinion, there was no requirement for the ALJ to discuss the Brolin evidence under Section 404.1520c.

The Court now turns to Cecil's argument that the ALJ was required to discuss the Brolin evidence to facilitate meaningful judicial review. As stated, the caselaw makes clear that the ALJ need not discuss every piece of evidence to facilitate review. What matters is that "the ALJ articulates at some minimum level [his] analysis of a particular *line of evidence*." *Phillips*, 91 F. App'x at 780 n.7 (emphasis added) (citing *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995)). Therefore, there is no need for the ALJ to discuss every piece of "cumulative" evidence. *Fisher v. Comm'r of Soc. Sec.*, No. 20-1467, 2021 WL 4288313, at *5 (W.D. Pa. Sept. 21, 2021) (citing *Phillips*, 91 F. App'x at 780 n.7).

Cecil first points to the fact that Brolin diagnosed him, with "post-traumatic stress disorder, panic disorder, and major depressive disorder." (Pl. Br. at 10 (citing AR at 1097).) These diagnoses were neither ignored nor overlooked as the ALJ acknowledged very similar diagnoses and even determined that they amounted to "severe impairments" under Step Two. (AR at 20, 22.) There was no dispute that Cecil suffered from mental illnesses such as those diagnosed by Brolin and it is clear that the ALJ was aware of and considered same. Thus, there was no need for the ALJ to discuss Brolin's particular diagnoses. In any event, "[a] diagnosis alone . . . does not demonstrate disability." *Foley v. Comm'r of Soc. Sec.*, 349 F. App'x 805, 808 (3d Cir. 2009) (citing *Pet. of Sullivan*, 904 F.2d 826, 845 (3d Cir. 1990)).

Next, Cecil points to Brolin's discussion of his various symptoms. (Pl. Br. at 10 (citing AR at 1127, 1213, 1219, 1239, 1244, 1322, 1324).) Specifically, Brolin noted that Cecil had trouble

sleeping, nightmares, anxiety, flashbacks, hypervigilance, increased anger and disturbance, and fear of harm to himself and family. She further noted that he was very emotional and socially isolated and that he felt helpless, fearful, and worrisome. As an initial matter, Brolin's notes, for the most part, simply restated Cecil's self-reported descriptions of his own symptoms. Brolin's recitation of these complaints "does not transform" them "into objective findings." *Hatton v. Comm'r of Soc. Sec.*, 131 F. App'x 877, 879 (3d Cir. 2005) (quoting *Craig v. Chater*, 76 F.3d 585, 590 n.2 (4th Cir. 1996)). Regardless, the ALJ acknowledged Cecil's symptoms, including many of these very same symptoms that Brolin identified, in reaching his conclusion. (*See, e.g.*, AR at 21 (discussing Cecil's "depression, anxiety, frequent nightmares/flashbacks, intrusive thoughts, dissociative episodes, paranoia, fear, social isolation, decreased sleep, hypervigilance, feelings of helplessness, and constant worry").) So again, there was no need for the ALJ to discuss *Brolin's* identification of these symptoms.

Cecil next highlights that Brolin referred to Cecil as "very symptomatic" and his anxiety as "incapacitating." (Pl. Br. at 10 (citing AR at 1097, 1242).) However, read in full context, the notes reveal that Cecil "became very symptomatic . . . *after viewing an incident that triggered him*," (AR at 1242 (emphasis added)), and that he suffers from "incapacitating anxiety *[at] times*," (*id.* at 1097 (emphasis added)). Cecil has not shown how frequently these episodes occur or how frequently they would interrupt his work. Accordingly, he has failed to carry his "burden" to show harmful error. *Holloman v. Comm'r of Soc. Sec.*, 639 F. App'x 810, 814 (3d Cir. 2016) (citing *Shineski v. Sanders*, 556 U.S. 396, 409 (2009)). Moreover, the ALJ considered Cecil's argument that his anxiety prevented him from working but ultimately concluded that his level of functioning as evidenced by the record was inconsistent with the claim that he was unable to work. (AR at 26.)

Cecil also mentions that Brolin assigned him a GAF score of 50 and the ALJ failed to reference this score in its opinion.[6] (Pl. Br. at 10 (citing AR at 1097).) This omission may otherwise, and in different circumstances, provide some support for a remand to the ALJ. "A GAF score of 50 or below indicates serious symptoms." *Rivera v. Astrue*, 9 F. Supp. 3d 495, 504 (E.D. Pa. 2014). Generally, an ALJ's failure to discuss both a GAF score that supports serious limitations and the medical records containing that score is cause for remand. *See, e.g.*, *Irizarry v. Barnhart*, 233 F. App'x 189, 192 (3d Cir. 2007) (vacating and remanding case where ALJ failed to consider GAF scores and the medical treatment leading to those GAF scores); *Logan v. Colvin*, No. 14-4571, 2015 WL 5722391, at *8 (D.N.J. Sept. 29, 2015) ("[T]he failure to discuss a GAF score is not by itself cause for remand, but the failure to discuss the medical records in which the GAF score appears may be."); *Rivera*, 9 F. Supp. 3d at 504–07 ("[D]istrict courts in the Third Circuit have repeatedly held that the ALJ's failure to specifically discuss a GAF score that supports serious impairments in social or occupational functioning is cause for remand. . . . A failure to discuss

---

[6] "A GAF score is a measurement[] of a person's overall psychological, social, and occupational functioning, and is used to assess mental health." *J.B. v. O'Malley*, No. 22-4226, 2024 WL 4898059, at *3 n.10 (E.D. Pa. Nov. 26, 2024) (citing Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. text revision 2000)). "The GAF scale ranges from 1 to 100, with a score of 1 being the lowest and 100 being the highest. A GAF score of 41–50 indicates an individual has serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Rios v. Comm'r of Soc. Sec.*, 444 F. App'x 532, 534 n.3 (3d Cir. 2011) (cleaned up). Despite the GAF being removed from the *DSM-5*, the Commissioner continues to consider GAF evidence. *See Hughes v. Comm'r of Soc. Sec.*, 643 F. App'x 116, 119 n.2 (3d Cir. 2016). "[W]hile GAF scores can indicate an individual's capacity to work, they also correspond to unrelated factors, and absent evidence that a GAF score was meant to indicate an impairment of the ability to work, a GAF score does not establish disability." *Bracciodieta-Nelson v. Comm'r of Soc. Sec.*, 782 F. Supp. 2d 152, 165 (W.D. Pa. 2011). GAF scores are not dispositive of disability, and "[l]ike other evidence, a GAF score may be accorded little or no weight depending upon its consistency with the other relevant evidence in the record." *Rivera v. Astrue*, 9 F. Supp. 3d 495, 507 (E.D. Pa. 2014) (citing *Torres v. Barnhart*, 139 F. App'x 411, 415 (3d Cir. 2005)).

GAF scores does not necessarily constitute error where the ALJ conducts a thorough analysis of the medical evidence regarding plaintiff's mental impairments.").

Here, assuming *arguendo* that the ALJ erred by failing to discuss the GAF score or the Brolin evidence, in light of the fulsome record and analysis provided by the ALJ, any such error was harmless. "Ordinary harmless error review, in which the appellant bears the burden to demonstrate harm, is applicable to" Social Security appeals. *Holloman*, 639 F. App'x at 814 (citing *Shineski*, 556 U.S. at 409). Because of this, "[a]n ALJ's failure to include a GAF score in his or her discussion is considered to be harmless error where a claimant has not explained how the GAF score would have itself satisfied the requirements for disability in light of potentially contradictory evidence on record." *Bracciodieta-Nelson v. Comm'r of Soc. Sec.*, 782 F. Supp. 2d 152, 165 (W.D. Pa. 2011). Here, Cecil makes a brief mention of the GAF score in his listing of aspects of the Brolin evidence that the ALJ failed to discuss and summarily states that "[t]his error is harmful to the Plaintiff as it is clear that the treating evidence of Pamela Brolin supports a finding of disability in this matter." (Pl. Br. 10–11.) He does not explain "*how* the GAF score would have" altered the analysis. *Bracciodieta-Nelson*, 782 F. Supp. 2d at 165. There was clearly "potentially contradictory evidence on record," *id.*, as indicated by the ALJ's citations to the other medical evidence in the record and Cecil's own Function Report in which he indicated that he could perform a myriad of functions of daily living, (AR at 25–26.) Accordingly, Cecil has failed to carry his "burden" of demonstrating that the error was harmful. *Holloman*, 639 F. App'x at 814. In fact, the Third Circuit has explained that a GAF score of 50 indicates that a claimant can "perform some substantial gainful activity." *Hillman v. Barnhart*, 48 F. App'x 26, 29 n.1 (3d Cir. 2002).

The same harmless error analysis applies to any other potential errors stemming from the ALJ's failure to consider the Brolin evidence. Cecil simply states that the failure to consider the

evidence was harmful without explaining *how* it would have impacted the ALJ's disability determination. (Pl. Br. at 11.) This is not enough for Cecil to carry his "burden" of demonstrating that the error was harmful. *Holloman*, 639 F. App'x at 814; *see also Padgett v. Comm'r of Soc. Sec.*, No. 16-9441, 2018 WL 1399307, at *2 (D.N.J. Mar. 20, 2018) ("Because Plaintiff has articulated no analysis of the evidence, the Court does not understand what argument Plaintiff has made here. Plaintiff has done no more than thrown down a few pieces of an unknown jigsaw puzzle and left it to the Court to put them together. The Court does not assemble arguments for a party from fragments.").

## B.    DRS. GLASS AND SCHLOSSER NOTES

Plaintiff next contends that the ALJ acted inconsistently by finding the medical opinions of Drs. Glass and Schlosser not inherently persuasive while at the same time looking to the findings of their examinations at Step Three.[7] (Pl. Br. at 11.) This purported inconsistency is resolved by the relevant regulations. For claims filed on or after March 27, 2017, such as Cecil's, certain categories of evidence are "inherently neither valuable nor persuasive to the issue of whether [a claimant is] disabled." 20 C.F.R. § 404.1520b(c); (*see* AR at 17, 64, 74 (noting that Cecil filed for benefits in March of 2022).) This category includes "statements on issues reserved to the Commissioner." 20 C.F.R. § 404.1520b(c)(3) (cleaned up). As the ALJ correctly observed, the opinions of Drs. Glass and Schlosser simply indicated that Cecil was incapable of performing his past work as a police officer. (AR at 27, 467, 473–74.) That is an issue reserved for the

---

[7] It does not appear that the ALJ actually discussed Dr. Schlosser's notes at Step Three. (*See* AR at 21.) Nonetheless, because the analysis is the same for the opinions of Drs. Glass and Schlosser, the Court will indulge Cecil's premise that the ALJ considered both at Step Three and discuss them together.

Commissioner. 20 C.F.R. § 404.1520b(c)(3)(vi). Accordingly, the ALJ properly concluded that these opinions were "not inherently persuasive." (AR at 27.)

However, just because the ALJ found the medical *opinions* unpersuasive, it does not follow that he necessarily must disregard the medical *evidence* contained in the reports alongside the opinions. *Cf. Coria v. Heckler*, 750 F.2d 245, 247 (3d Cir. 1984) ("[I]t is important to distinguish between those portions of the physicians' reports that represent the physician[s]' medical findings and those portions of the reports that represent conclusions as to the claimant's disability for purposes of worker's compensation.") Indeed, contrary to the view of Plaintiff, the ALJ properly considered the medical findings of Drs. Glass and Schlosser. *Cf. id.* at 248 (vacating ALJ's decision due to failure to consider "medical findings set forth in the medical reports for submission with the worker's compensation claim"). Accordingly, the ALJ's decision to look to the medical findings of Drs. Glass and Schlosser at Step Three, while disregarding their ultimate medical opinions, was proper.

### C.    VE Testimony

After the hearing, Cecil objected to the testimony of the VE because the VE admitted that he did not consider "Reasoning Codes" in providing his testimony. (AR at 313.) The ALJ did not respond to this objection in his written decision—and the Commissioner does not argue otherwise. (*See* Def. Opp. at 15–17.) Accordingly, Plaintiff argues that this omission violated his right to respond to administrative action under *Heckler v. Campbell*, 461 U.S. 458, 469 (1983) and the ALJ's requirement to address objections under the Administration's Hearings, Appeals and Litigation Law Manual. (Pl. Br. at 15.) The Commissioner responds that this was harmless error, since it only implicated one of the three occupations identified by the VE. (Def. Opp. at 16–17.)

As explained above, "[o]rdinary harmless error review, in which the appellant bears the burden to demonstrate harm, is applicable to" Social Security appeals. *Holloman*, 639 F. App'x 814 (citing *Shineski*, 556 U.S. 409); *see Peterman v. Berryhill*, No. 18-13751, 2019 WL 2315016, at *7 (D.N.J. May 31, 2019) (applying harmless error analysis at Step Five). Harmless error has been specifically applied in the context of an ALJ's failure to respond to post-hearing objections to a VE's testimony. *See Cortez v. Berryhill*, No. 17-1493, 2018 WL 4103622, at *2–3 (S.D. Tex. July 23, 2018), *report and recommendation adopted*, 2018 WL 3863484 (S.D. Tex. Aug. 13, 2018). To show harmful error, Cecil "must clearly identify the error and explain how the error actually 'affected his substantial rights.'" *Holloman*, 639 F. App'x at 814 n.3 (cleaned up) (quoting *Shineski*, 556 U.S. at 407); *see also Rutherford*, 399 F.3d at 553 ("[R]emand is not required here because it would not affect the outcome of the case.").

By way of background, the Dictionary of Occupational Titles ("DOT") "lists and defines all jobs available in the national economy and specifies what qualifications are needed to perform each job." *Zirnsak*, 777 F.3d at 616 (internal quotation marks omitted). The DOT provides "[r]easoning levels" for each job. *Id.* These levels range from 1 at the lowest to 6 at the highest. *Id.* As is relevant here, "jobs with a reasoning level of 3 require that an employee be able to '[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form [and d]eal with problems involving several concrete variables in or from standardized situations.'" *Id.* (alterations in original) (quoting *Dictionary of Occupational Titles*, app. C, 1991 WL 688702 (4th ed. 1991)).

Sometimes, an ALJ will consider both the DOT and testimony from a VE. *Id.* at 616–17. When these two sources appear to conflict, the ALJ must "elicit a reasonable explanation" from the VE and "explain in its decision 'how the conflict was resolved.'" *Id.* at 617 (quoting *Burns v.*

*Barnhart*, 312 F.3d 113, 127 (3d Cir. 2002)). "An ALJ's failure to comply with these requirements may warrant remand in a particular case." *Id.* However, remand is not required "so long as 'substantial evidence exists in other portions of the record that can form an appropriate basis to support the result.'" *Id.* (quoting *Rutherford*, 399 F.3d at 557).

Here, The ALJ found that Cecil had the RFC to "perform simple, routine tasks and make simple work-related decisions." (AR at 22.) Then, relying on the VE's testimony, the ALJ found that Cecil could work as a marker, routing clerk, and mail clerk. (*Id.* at 29.) The mail clerk job requires a reasoning level of 3, while the marker and routing clerk jobs only require reasoning levels of 2. *Dictionary of Occupational Titles*, 209.687-026 Mail Clerk, 1991 WL 671813 (4th ed. 1991); *Dictionary of Occupational Titles*, 209.587-034 Marker, 1991 WL 671802 (4th ed. 1991); *Dictionary of Occupational Titles*, 222.687-022, Routing Clerk, 1991 WL 672133 (4th ed. 1991). After the hearing, Cecil objected to the VE's testimony. (AR at 313–14.)

Starting with the mail clerk job, Cecil objected that his limitation to simple tasks was inconsistent with a job requiring a reasoning level of 3. (*Id.* at 314.) The Third Circuit has held that there is not "a *per se* conflict between a job that requires level 3 reasoning and a finding that a claimant should be limited to simple and routine work." *Zirnsak*, 777 F.3d at 618. Instead, a court should determine whether "the record establishe[s] that the claimant in question [can] perform a level 3 reasoning job, despite a limitation to simple work." *Id.* However, assuming *arguendo* that Cecil is correct that he could not work as a mail clerk, any error was harmless for the reasons discussed below.

This leaves the marker and routing clerk occupations, both with a reasoning level of 2. The Third Circuit has explained that "[w]orking at reasoning level 2 would not contradict" a very similar RFC allowing for work that is "simple, routine and repetitive" *Money v. Barnhart*, 91 F.

App'x 210, 215 (3d Cir. 2004); *see also Zirnsak*, 777 F.3d at 618 (noting that even courts that have found that claimants limited to simple, repetitive tasks could not perform jobs requiring reasoning level 3 have held that such claimants could perform jobs requiring reasoning level 2). Additionally, other courts have concluded that RFCs *identical* in the relevant part to Cecil's are consistent with performing work at reasoning level 2. *See Ariel R.L. v. Comm'r of Soc. Sec.*, No. 23-1379, 2024 WL 4343573, at *4–5 (D.P.R. Sept. 30, 2024); *DeLeon v. Kijakazi*, No. 22-1387, 2023 WL 8242132, at *4, *7 (E.D. Cal. Nov. 28, 2023). Cecil has not explained why his RFC would prevent him from performing jobs with a reasoning level of 2.

The ALJ found, and Cecil does not challenge, that the marker and routing clerk occupations totaled approximately 286,421 jobs in the national economy. (AR at 29.) In fact, the one occupation that Cecil's objection would have plausibly required the ALJ to disregard, the mail clerk occupation, only represented 12,746 jobs in the national economy. (*Id.*) It strains credulity to think that this de minimis decrease in the number of jobs available nationally would have altered the ALJ's analysis, and Cecil does not argue that it would have. In fact, the Third Circuit has repeatedly found that far fewer than 286,421 jobs were sufficient to support an ALJ's finding that significant jobs existed in the national economy. *See, e.g.*, *Lamoureux v. Comm'r of Soc. Sec.*, No. 21-1677, 2021 WL 5860738, at *2 (3d Cir. Dec. 10, 2021) ("[T]he vocational expert's testimony that nearly 36,000 jobs were available in the national economy supports a finding that work existed in significant numbers."); *Sanchez v. Comm'r of Soc. Sec.*, 705 F. App'x 95, 99 (3d Cir. 2017) (18,000 jobs was "sufficiently significant to support the ALJ's decision" (internal quotation marks omitted)); *Young v. Astrue*, 519 F. App'x 769, 772 (3d Cir. 2013) ("[T]he testimony from the vocational expert that 20,000 jobs were available in the national economy is sufficient to support a finding that work exists in significant numbers.").

22

As is obvious, even removing the mail clerk job, significant jobs still existed in the national economy to support the ALJ's conclusion. Accordingly, the Court has little trouble concluding that "substantial evidence exists in other portions of the record" to support the ALJ's conclusion, rendering any error from the ALJ's consideration of the mail clerk job harmless. *Rutherford*, 339 F.3d at 557. Because Cecil's objection would have simply required the ALJ to disregard the mail clerk job, and any error stemming from consideration of that job was itself harmless, the ALJ's failure to address the objection was also harmless. *See Stacey S. v. Comm'r of Soc. Sec.*, No. 21-20433, 2022 WL 16834673, at *8 n.9 (D.N.J. Nov. 8, 2022) (citing *Rutherford*, 399 F.3d at 553).

## **CONCLUSION**

Having reviewed the record as a whole, the decision of the Commissioner is **AFFIRMED**. An appropriate Order accompanies this Opinion.

**ROBERT KIRSCH**
**UNITED STATES DISTRICT JUDGE**

<u>Dated</u>: October 14, 2025